Court is case number 191758, Inter-Tribal Council of Arizona v. United States, an appeal from a decision of the Court of Federal Claims. The Inter-Tribal Council of Arizona is here because in exchange for closing the Phoenix Indian School, Congress mandated Indian Education Trust Fund payments to Arizona Indian Tribes. On page 29 of the Blue Brief, ITCA argues that in the government's lawsuit against Collier, the government did not collect and did not seek to collect the full value of all remaining payments due once Collier defaulted. Can you provide a cite to the Act or otherwise supporting the imposition of a duty upon the government to collect all payments from Collier and how does any such duty relate to the government's duty to hold and trust security against Collier's obligations, which I think is a separate issue? How do they interrelate? Yes, Your Honor. The Act at section 403C2, which is in the appendix at 111, says that there shall be made 30 annual payments equal to the interest due under the 30-year payment option and even though the statute says that Collier shall make those, those are to be made to the United States. So therein lies the duty to collect. And Your Honor asked about the duty to secure, which is of course in section 405C2, which is in the appendix at 115. That's the key term which says that the Secretary of the Treasury shall hold and trust the security for the annual payments and for the final payment under the 30-year payment option. So there are two separate. I know that. I want to know about how they interact with each other. From my view, one is a harder road to hoe than the other. Yes, Your Honor. The collection duty would be a little bit more implicit, but it could be from, as I said, the statute requires Collier to make the payments to the United States. That's the implicit duty to collect. The security duty is far more expressed, as Your Honor says. I understand, but that's why I'm concerned about the first, the collection. The United, yes, Your Honor, the United States. Is there, for example, a statutory history that places a unique burden on the government? In this statute, it's a very unique burden on the government. I know, in part, but go ahead. Well, and as Your Honor said, the United States could have chosen to collect all the payments from Collier. What the United States did vis-a-vis Collier is what the United States did vis-a-vis Collier. But that doesn't, in and of itself, eliminate or reduce the statutory duties on the United States. It is true that at the end of the day, after the lawsuit was filed and there was a settlement, the total amount of payments due from Collier were not recovered. But what is your support for the proposition that they never even sought to recover the total payments? Yes, Your Honor, because in U.S. v. Collier, the United States was of the view that it needed to enforce the contractual terms that it had agreed to with Collier to supplement the security for the payments that Collier had not made up until the point in time of the settlement, the default to the settlement. In other words, the United States was of the view that Collier only owed what was due under the contractual, or that Collier was only required to supplement the security up until the point of default and the settlement in the case. The U.S. did not seek to collect the payments, the full 30 years of payments. The United States' view is that whenever Collier defaults, the default eliminates the remaining unpaid required payments. That's their view. So that's what they sought to collect. And that fell short. And the United States didn't have the security to make the trust funds whole with the required 30 annual and single final payments under the Act. Well, what's your response to the argument that with respect to the security, you had already filed a lawsuit much earlier saying the security is not good enough, and the court had ruled and said that there was no jurisdiction for the court to address that fact? Yes, Your Honor. The terms of the security that the U.S. agreed to with Collier did fall short of what the Act required. And the Inter-Tribal Council of Arizona knew that and was very concerned. The difference is, as Your Honor said, those claims were precluded from being heard by the district court. But that doesn't preclude claims for damages against the United States. As the United States told the court, the district court in Lujan, in part to get the result that it got. The claims for damages are not precluded in the Court of Federal Claims because they are a different cause of action. There was no preclusion under the law. I think that's the Mosley and the Krall cases that we cite. And there was no collateral estoppel because they were never actually and fully and fairly the typical requirements of collateral estoppel. And more importantly, in 1992, when the Lujan case was decided, we were even four years away from Collier starting to make payments. As long as Collier was making payments, there was the possibility that the United States correctly understood the Act and could correctly secure all the payments that were required under the Act. They had the tools to do that. When it became clear that they didn't, that occurred after Collier stopped paying in 2011. And when the United States disclosed to ITCA in March of 2013 that Collier had defaulted and the security was insufficient, those are the events that fixed the liability of the United States. As long as Collier was paying, it didn't really matter. But the United States never disclosed to ITCA that the security was deficient, not after liens were released in 1998 and 2007. ITC knew that the liens were released, right? They did not, Your Honor. No, never knew. Had no idea until post-2013 as this litigation was being developed. No, nothing in the documents that the United States negotiated with Collier required the United States to inform ITCA of the value, the actual level of the security. But there was in the contract the fact that the United States agreed to release liens. Yes, Your Honor, that is true. But there was no, in fact, the United States completely disavows that ITCA had any role in negotiating the documents or any beneficial interest in the things that were negotiated in those documents. The United States did not, of its own volition, provide information to ITCA. Moreover, because the United States chose real property and real property interests as the security required by Congress for these trust fund payments, the valuation was always fluctuating. The United States did not hold liquid security. It held real property. And in Phoenix, that was a volatile thing to do. But the United States never did anything that could have required, under its own terms, it could have required Collier to supplement the security in 1998 when it did the first lien release. It could have required Collier to supplement the security in 2007. It could have required Collier to supplement the security in 2008 when there was a major economic downturn that diminished, depleted the value of the security, as Collier knew himself when he tendered the property and when he defaulted. In Collier's own words, and only Collier ever did appraisals on these properties, it was $6 million. That's why the United States turned that down and sued Collier for a little bit more. But we're still short. This is a very unique act of Congress. The United States, at the height, has operated over 350 Indian boarding schools in this country. Never before, with the closure of one of these schools, has Congress turned the value of the property underlying the school into mandatory trust fund payments for Indian education. That is the testament to how Congress recognized the value of this property, which, as the General Accounting Office stated, was quite possibly the most valuable piece of property in the late 1980s in the western United States. Congress recognized that and turned it into this very specific payment and security scheme that is unlike many other statutes, although it's close. You have another minute before you run into your rebuttal time. Aren't you going to mention the word fiduciary? Yes, Your Honor, I will. The United States has fiduciary duties imposed on it by Congress under this statute, and they are in breach of those. And like in White Mountain Apache, which is a close, comparable statute, holding trust, the United States is liable for breach of those fiduciary duties, which Congress put full control in the United States to comply with. And they chose not to. That's why you're here. How much would have been the appropriate security under the act? The answer to that, Your Honor, is whatever it takes to secure any and all unpaid remaining payments at any time. Now, the payments are— At 130 percent, though. The United— Yes, Your Honor. The United States itself realized that it needed to enhance the security requirements because it agreed to those lien releases, again, on volatile, fluctuating value real property interests. So, yes, they enhanced their own requirement and still didn't— still didn't meet it. Okay. I'll save the rest for the following. May it please the Court. Phil Seligman from the United States. When did the government first become aware that Collier's debt was under collateralized? That's a— I guess that is a little— it's not clear when we actually learned that it was— they sent a letter to the United States at the time that they notified that they were no longer going to make any payments in 2012. And they notified at that time that the value of the property had gone down so much that it was only worth six or seven million dollars. And at that time, obviously, that is under collateralized. But the way the collateral was set forth— Do you agree that the United States was in a fiduciary relationship? The United— the only fiduciary relationship the United States had was to collect the payments made by Baron Collier and deposit them into the trust. That's the fiduciary relationship. And— Well, but the Act provides for collateral being secured. Well, no, the statute— there is no statutory obligation in the 1988 Act that the United States obtain or maintain any level of security. The Congress left it up to the Secretary how much security would be— Soybean futures? Soybeans— what— it was entirely up to the Secretary. Now, what the Secretary chose to do was target the principal instead. That's what the real dispute is about, whether you target the principal value, which is 34.9 million, or whether you, as ITCA alleges, you had to target security at 30 years of interest payments plus the principal, which would get you— So we're talking about 34.9 million— But the interest payments were a critical part of the benefit to ITCA, right? Well, the— obviously, Congress had, in the 1988 Act, it had quite a few different purposes for the Act. It didn't— it wasn't just about providing supplemental money for education at all. Doesn't the Act require that the property be held in trust for the benefit of the ITCA? No, the Act— there's no provision that requires the property— it's simply that whatever security the United States obtained in the trust fund payment agreement, the agreement that it had with Collier, there's a requirement that it hold that security in trust, and there's no allegation that the United States didn't hold the security it obtained. The dispute is about whether it obtained enough security, whether, again, the target should be 34.9 million, the principal, which, as we learned, Congress wasn't operating in a vacuum. They had a CBO analysis which shows if you get 34.9 million at the beginning, over 30 years, that's worth the exact same amount as having 30 payments at 8.5% interest. Let me ask you a hypothetical question. Supposing I read the Act as having required that the United States hold the property in trust, that would create a fiduciary obligation, a fiduciary relationship, and allow monetary damages for breach of that, would it not? Well, I guess, let me— first, the premise is that this was federal property. This was not— I think that's one of the biggest distinctions between this and other Indian trust cases. This was entirely federal property, and the only amount of money that was going to ITCA was based on the differential between the property that Barron Collier owned in Florida and the Indian School property. So the entire Indian School property was worth— And their own, and interest. Well, yeah, each of the payments, but I'm saying the property itself was worth $80 million. Congress did not identify that $80 million should be put into trust for— so it wasn't the entire value. What was put into trust was either $34.9 million up front or 30 years of payments plus $34.9 million. But really, what was supposed to be— the security was supposed to be the 130%, and so my question is, at the time you released the liens, what seemed like a sort of silly thing to do, frankly, but why release liens on very valuable property in downtown Phoenix? But at the time you released the liens, did the government confirm that there was enough security to cover 130% of the value of the payments? Yes. Well, that's not what 130% was. It was— that's, again, it gets back to what the target is. Well, there's two things sort of tied up in that question. One is, it wasn't a question of silly or not. The United States was obligated to do it under the trust fund payment agreement. It was obligated to release liens if you showed that the release level amount had been reached, and the release level amount was accrued interest payments. So if they were behind on any payments, you add that in, plus unpaid principal, which is $34.9 million, and then you subtract out the value of whatever the property is, whatever liens there are, and you subtract out the annuity. So the question is, if you're over that target, and again, it's 130% of that, then you— Collier would have to— if it falls below that level, Collier had to infuse collateral to get the value back up. So at the time of the release of the liens, in 1998 and 2007, there was no evidence that the value of the security had fallen below the level that was agreed to in the trust fund payment agreement. The dispute is about whether the target was proper or not. That's what ITCA alleges that the United States had to target this 100— if you do the math, it's about $123 million, almost $124 million, because that's 30 years of payments plus the 34.9. Yeah, but it's a classic present value analysis. I mean, you're saying that it's $34 million, but you're not going to get it for 30 years. So, of course, there has to be other value, because $34 million can't be the bogey if you have to wait 30 years for it. Well, no. It's 30— it would be, under a default, it would be $34.9 million right now, and then it gathers interest for 30 years on the $34.9 million. That's the value— that's what the CBO analysis was, is that $34.9 million right now, at day one, is equal to $34.9 million plus 30 years of interest payments. Plus all the interest, right. So those are equivalent. So if you get collateral for $34.9 million on day zero, and Baron Collier defaults on day zero, you will have the exact same amount 30 years later. So we still haven't gotten to the end of the 30 years, and the only reason we're having this dispute is because interest rates went down over the— since 1988. At the time of 1988, they were in the 8.5 to 10 percent range. That can't be the only reason. In the government's suit against Collier, the government in Collier stipulated that the value of the remaining Phoenix Indian School property was $25 million, but the GSA sold it for $18.5 million. Well, that's another example of what happens with security. When you have— obviously, at the time, as a trustee, you can't— all you can do is have an appraisal, and that gives you the value of the property. Did you make a Rule 60B motion in the District Court in Arizona to reopen based on mutual mistake? Well, there wouldn't have been because the case was resolved by a settlement. We had a— at the time in Arizona, we used the formula from the contract, which is 100— we were filing suit to require a supplement of the collateral. And so, at the time, all we can do is anytime you have land value, you use an appraisal, and that's the best estimate of the value. Obviously, once you actually have a sale later, the market value can be different. So there's an appraisal done that's both Barron Collier and the United States that comes up with $25 million, and then when GSA actually sells it, it only gets an 18 and a half. There's no case law that would make the United States a guarantor for the value of— that— the falling value of the property. Now, supposing you're a fiduciary? There is— I'm saying if you accept— if the hypothetical is that there is a fiduciary duty, you still can't make the United States a guarantor under any circumstances. But the key is to look at whether there actually is an obligation in the statute, and I think that's where the place to start is to actually find any provision. And there is no statutory provision that requires the United States to obtain or maintain any level of security, and there is no— Wait, wait, wait. You previously referred to the 130 percent and the lien releases. The deed of trust allowed Collier to request release of portions of the trust estate if the value exceeded 130 percent. Who negotiated that term? Well, that was a negotiation back and forth between Collier and the United States. It was— but it's— you have— if you're going to look at the release level amount, you have to also look at it in conjunction with the maintenance of supplemental collateral in 6.3. That's what the United States— that also is essentially a form of security that the United States has, which is if the value of the security— and again, we're talking about land— if the value of the land goes down, the United States negotiated the burden on Collier to then supplement the trust estate with government-backed securities to bring the value back up to where it should have been. And if Collier didn't do that— Wait, wait, wait. —that the government was a figure-sharing in, as it concerns the requirement to hold in trust security against Collier's obligations under the promissory note, if you're holding it in trust, how do you release the liens on that downtown development interest? I know you're saying, well, we were happy, but it's not a we were happy standard, it's a fiduciary standard. The key is to look back at what the language is. And if you're going to find a fiduciary responsibility, the only place you can find it is in the provision that says, hold in trust the security provided in the trust fund payment agreement. Again, trust fund payment agreement did not exist at the time that that language was put into the statute. So the United States, because the statute left entirely up to the secretary what the level of security would be. And so then that is part of the security that the United States negotiated. It's both this release level amount, it's the obligation to supplement it, but it's also you must release the liens if it is at a certain level. So that is all part of the terms of the trust fund payment agreement, which if you, again, do find that that particular language that says, hold in trust in accordance, you can't leave out, if you'll notice in the briefing, the end of that sentence is left out of all the times that ITCA quotes the statute, which is in accordance with the trust fund payment agreement. So the act was not just hold security and nebulous, it was hold security in accordance with the trust fund payment agreement. And under that trust fund payment agreement, I'm still having a hard time. Whose obligation was it to monitor the level of the security? Like Baron Collier. The Baron Collier had an obligation to monitor, and if they didn't, which as it turned out, they didn't here, when they default, the United States can then sue and get the collateral back up to the level that had been. Well, that's a little bit like the fox and the chicken coop, right? I mean, they got to pay attention, they were supposed to monitor it, and while it just kept diminishing, the government wasn't requiring any kind of reports or anything? Well, the government has the benefit of being able to sue and require them to add government backed securities to bring the level back up. But it took them a long time before they filed suit, right? No, the United States, we sued within a year and a half after they notified that they were no longer going to make any payments. And so, again, with land and the trust estate, the land value obviously can fluctuate, and even as here, you can have an appraisal, and then when the actual market value, when it's sold, it can be less. So the key was having this maintenance of collateral provision that allowed the United States to then require Baron Collier to supplement, to bring it back up. The dispute, again, is not about the issue of whether we can require supplemental security. The main dispute here is about what should have been the original target. Should it have been the principal, or should it have been four times that, $123 million for how much security negotiated? And Congress left it up to the Secretary as to what a level would be negotiated for, and then required that the United States hold whatever security it negotiated, hold it in trust. How did the United States acquire that property, original? I only know from the record that it was 1891. I obviously, I don't know exactly which tribe or group of tribes may have had it or may have, it may have separately been owned. I do not know the history of before 18, I know since 1891 it was federal property, and the Ninth Circuit noted specifically in its decision back in 1995, after the first time ITCA tried to sue about the inadequacy of collateral. The Ninth Circuit noted specifically the various interests that were involved in this land exchange. There was a veteran's hospital that was going to be used on the site, and that this was the only statute involved here that could possibly create any fiduciary duty is the 1988 Act. There was no earlier general trust obligation to Native Americans or Indian tribes at the time that would apply to any of the issues here. And again, ITCA doesn't identify any other possible statutes, so if you're going to find an obligation, I see my time is up, but if you're going to find any obligation, you can only find it in the 1988 Act, and it doesn't exist. I was curious whether the government acquired it under the 1868 treaties, and from whom, but if you don't know, you don't know. I don't know. I'm certain, perhaps ITCA knows, but I do not know. Okay, thank you. Do you know the answer to that question? Your Honor, I do. When there was going to be an Indian school, it was originally going to be at Fort McDowell, another former military site. The city of Phoenix wanted the school more centrally located because of the labor source that the Indian children would provide, so the city of Phoenix sold the land to the United States. Thank you. And I also wanted to clarify, in response to Your Honor's question, in our complaint, which is at appendix 072, paragraph 182, the United States admits the security was insufficient as of 2007. That came out. What's the site for that? I'm sorry. I just flipped back from it. Sorry. It's in the appendix at 072, it's in our complaint at paragraph 182, the citation to when the United States now admits it knew the security was insufficient as early as 2007 and 2008. I think we drew that from the Collier case. What about the language of the Act? I asked that question, Your Honor. So that provision about the Secretary of the Treasury holding in trust, okay, in accordance with the trust fund payment agreement. So the trust fund payment agreement had to comply with the Act. The Act does require a trust fund payment with the 30-year option, but that trust fund payment had to comply with the Act. The Act reflects Congress' understanding that it knew Collier could default at any time under the 30-year option. And it's pretty simple. 30 years of annual payments and a final payment at the end. That is what had to be fully secured because Congress knew. Yeah, I'm interested in the fiduciary obligation. It is a fiduciary obligation. And not only that, it put full control in the United States to comply with the fiduciary obligation. Well, it not only put full control, my concern is that having full control, the fiduciary failed to notify the beneficiaries of any problems. So, how much did your clients have to know? And as far as I can tell from the record, the government's position was nothing. That's correct, Your Honor. The government, as it was required to do under the Act, consulted with ITCA and the Navajo Nation regarding the payment option. Beyond that, the government was in full control and negotiated the terms with Collier, including no personal recourse, which made it all the more important that the security that the United States, under this Act, was required to hold met the obligations of the Act. Under the Trust Fund Payment Agreement, do you agree that it was Collier's obligation to monitor the security? Yes, Your Honor, I agree that. That is a contractual term between the United States and Collier. And I think that was part of the court's opinion in the district court in the U.S. v. Collier case, that it was somehow an assigned—I don't think that the court there got into it. I don't think that under this Act, there's any authority for the United States to assign any of the security duty to Collier, but to the extent it was a valid assignment, it just doesn't relieve the United States of its statutory obligations to hold the required level of security and trust, so that any time during that 30 years, that's all they had to do. But what's your response to the statement that it really depends on what your target is, so that, in other words, the government says all they had to do is have security for $34 million, not for $34 million plus the interest payments? Your Honor, that is absolutely incorrect under the Act. They had to have security for all 30 annual payments and the final payment. That's the payment scheme of this Act, and all the United States had to do was secure it. That's all they had to do, and they didn't. I see my time is almost up. Thank you, Your Honors.